COMMONWEALTH vs. ERIC A. AVELLAR.

Bristol. May 5, 1993. - November 12, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Homicide. Evidence*, Expert opinion, State of mind, Hearsay, Consciousness of guilt. *Practice, Criminal*, Instructions to jury. *Malice.*

At a murder trial, the evidence was sufficient to warrant the jury in finding beyond a reasonable doubt that the defendant inflicted fatal injuries on his six month old child. [411-415]

At the trial of a defendant charged with the murder of his six month old child, no substantial risk of a miscarriage of justice was occasioned by the unobjected-to admission of an emergency room physician's testimony, as well as a child abuse report prepared by the physician as part of the victim's medical record, each stating the physician's opinion that the defendant behaved inappropriately on viewing the victim's body at a hospital, where the admission of this evidence was within the judge's wide discretion with respect to expert opinion [415-418]; furthermore, this court rejected the defendant's contentions that the physician's testimony and report were admissible only under standards applicable to scientific testing methods [418], and that they amounted to inadmissible "profile" evidence [418].

At the trial of a defendant charged with the murder of his six month old child, testimony that, during the mother's pregnancy, the defendant had urged her to have an abortion was properly admitted as relevant to the defendant's attitude toward the child at the time of the child's death. [418-419]

Where, at a murder trial, a police officer was permitted to testify, without objection, concerning a conversation she had had with the defendant in which reference was made to the size of the defendant's hands being consistent with his having inflicted the victim's fatal injuries, this testimony should not have been allowed to stand; however, as the size of the defendant's hands was not an issue bearing on the identification of him as the assailant, the admission of the officer's testimony did not create a substantial risk of a miscarriage of justice. [419-420]

At a murder trial, no substantial risk of a miscarriage of justice resulted from the judge's failure to instruct the jury concerning evidence of consciousness of guilt. [420-421]

Where the principal issue in contention at a murder trial was the identity
of the assailant, and not malice, the judge's correct, but overly inclu-
sive, description of malice in his instruction to the jury, to which no
objection was taken, did not create a substantial risk of a miscarriage
of justice. [421-422]

Evidence at a murder trial was sufficient to warrant the jury's finding that
the murder of the victim, a six month old infant, had been committed
with extreme atrocity or cruelty. [422]

INDICTMENT found and returned in the Superior Court De-
partment on November 15, 1989.

The case was tried before *William H. Carey,* J.

*Wendy Sibbison* for the defendant.

*Cynthia A. Vincent,* Assistant District Attorney, for the
Commonwealth.

O'CONNOR, J. A jury found the defendant guilty of the
murder in the first degree of his infant son Shawn based on
extreme atrocity or cruelty. The judge sentenced the defend-
ant to life in prison, and the defendant appeals.[1] The defend-
ant makes the following arguments: (1) "Since the evidence
required the jury to speculate as to when the fatal blow was
delivered and as to who delivered it, [the defendant] is enti-
tled to an acquittal"; (2) "The admission [in evidence] of
Dr. [Robert] Korn's opinion that [the defendant] killed
Shawn, based on groundless 'profile' evidence, created a sub-
stantial risk of a miscarriage of justice"; (3) "The trial judge
erred in permitting the Commonwealth to introduce evidence
that [the defendant] wanted Laura Courtney [Shawn's
mother] to have an abortion as probative of [the defendant's]
'attitude toward the child' "; (4) "The prosecutor improperly
elicited previously stricken hearsay opinion evidence and
prejudicial vouching evidence"; (5) "The trial judge erred in
failing to give any instruction on consciousness of guilt and
in giving harmful, erroneous instructions on malice"; (6)
"The cumulative effect of the above errors requires reversal";
and (7) "The evidence was insufficient to support the jury's

---

[1]The defendant's counsel on appeal did not represent him at the trial.

verdict of murder committed with extreme atrocity or cruelty; and, even if minimally sufficient, the thrust of the evidence calls for [a new trial or] reduction to second degree murder." We conclude that there was no reversible error and we are not persuaded that justice requires a verdict of less than murder in the first degree. Therefore, we affirm the judgment.

The defendant's first argument raises the question whether the evidence was sufficient as a matter of law to warrant a finding that the defendant, not someone else, caused the injuries that resulted in Shawn's death. We must determine whether, if the jury believed the evidence most favorable to the prosecution bearing on that question, they would have been warranted in inferring beyond a reasonable doubt that the defendant caused the fatal injuries. *Berry* v. *Commonwealth*, 393 Mass. 793, 795-796 (1985). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). The record contains the following trial evidence. Laura Courtney became involved in an affair with the defendant in July, 1988. Both were married but separated from their spouses. After Courtney became pregnant, the defendant told her he wanted her to abort the baby, explaining, among other things, that his divorce was not yet final and he was already paying support for his son. Courtney did not have an abortion, and for the remainder of her pregnancy saw little of the defendant. The baby, Shawn, was born April 11, 1989. Several weeks later, following Courtney's request, the defendant went to Courtney's house to see Shawn. A few weeks later the defendant again visited Shawn and then visited him "a couple times a month" during the next several months. The defendant babysat for Shawn three or four times. After one such occasion, Shawn had "a little mark on the side of his eye." The defendant explained that Shawn had rolled off the couch.

Shawn's pediatrician testified that, during three routine office visits, the child's physical examinations were normal, with proper growth and development. The doctor never detected any injuries or bruises on the child. In addition to the

routine visits, the doctor also consulted once by telephone with Courtney in late August, when he prescribed over-the-counter medication for an upper respiratory infection.

Shawn was pronounced dead at the hospital October 6, 1989, at 7:23 A.M. Shawn had spent much of the previous day, October 5, with Courtney and her neighbor, Lori Cote at Cote's apartment. Shawn appeared to be a happy baby that day. "He smiled, laughed." He was getting over a cold. Beginning at 4:30 P.M., Cote's brother and his girlfriend, Amie Fontaine, babysat Shawn while Courtney and Cote purchased beer at a package store. After their return, Courtney fed Shawn at 6:30 P.M., and then Courtney and Cote went to visit Courtney's cousin, Paul, while Fontaine babysat for Shawn as he slept. While at Paul's house, Courtney telephoned the defendant and, as a result, the defendant came to Paul's house. Shortly thereafter, Courtney and the defendant returned to Courtney's apartment, which Courtney then left to go to Cote's apartment to retrieve Shawn. It was then about 9 P.M. Shawn was sleeping at Cote's apartment and Courtney woke him up. She did not have "any problems" waking him up and he smiled at her. Fontaine testified that she did not "do anything to [Shawn] that night," and she did not see anyone strike or injure him in any way.

Courtney returned to her apartment with Shawn. The defendant offered to babysit while Courtney and Cote went to a local bar. As Courtney was getting ready to leave, the defendant's friend, Tracey Payne, came to visit the defendant. Payne testified that he was at Courtney's apartment for about one-half hour with the defendant and Shawn and that Courtney was there part of the time. Payne remembered Shawn being put to bed before Courtney left, but he did not remember who did that. He was sure that Shawn was not on the couch when Courtney left. Payne did not touch Shawn.

At 11:30 P.M., October 5, Courtney called the defendant to check on Shawn. The defendant told her that Shawn "fell off the couch, but he's all right" and he "put him to bed." When Courtney returned home at 12:30 A.M., October 6, the de-

fendant was asleep on the couch. She checked on the baby from the doorway of his room and woke up the defendant. After she and the defendant went to bed together, she wanted to discuss their relationship. As the defendant did not want to have this discussion, he fell asleep. She then got out of bed and went to the kitchen, where she wrote him a love note.

The alarm awoke them at 5:30 A.M. and the defendant arose, without speaking, ten or fifteen minutes later. Fifteen minutes after the defendant arose, Courtney heard him say to Shawn, "I have to change your diaper, and you have to go to the doctor's." She then heard Shawn make a "weird noise," as if gasping for air. The apartment was quiet for the next fifteen minutes or so. According to Courtney, the defendant left for work at approximately 6:45 A.M. When the defendant left, Courtney got out of bed and observed the defendant leaving the building.

She then went to check on Shawn, who appeared to be sleeping. After he did not respond to his name, she touched his hands, which were cold. When she picked him up, Shawn was limp, had half-closed eyes, and appeared not to be breathing. She brought him into the living room, set him on the couch, dialed 911, and attempted to resuscitate him. When the rescue team arrived, Courtney was hysterical. The emergency medical technician noted that Shawn had a pulse but appeared in respiratory distress. While being transported to the hospital, Shawn stopped breathing, and then his heart stopped. The hospital's efforts at resuscitation were unsuccessful, and Shawn was pronounced dead at 7:23 A.M. Dr. Korn, the emergency room physician who first examined Shawn, found a bulging fontanel (the soft spot on a baby's head) and several bruises on the face and hands. He also observed retinal hemorrhages in back of Shawn's eyes that were bright red, implying that the injury to the head was "relatively new." His initial diagnosis was "child abuse and death due to head trauma."

Dr. John C. DuVally performed an autopsy and concluded that the cause of Shawn's death was a "[m]assive skull frac-

ture with bleeding due to head trauma." Dr. DuVally explained that death likely occurred when the injured brain expanded and pushed down on the brain stem. His examination of Shawn further revealed several faint superficial bruises on his head, chest, and back; a ruptured frenulum (the web of skin between the upper lip and the upper gum); three fractured ribs; and blood in the pleural and abdominal cavities. He was unable to form an opinion as to the amount or nature of the force necessary to cause the fracture, but he concluded that the injuries were consistent with "[s]ome sort of force being applied to the back of the head." He further concluded that the injuries were not consistent with "shaken baby syndrome" or a fall from a two or three foot couch.

Of critical importance to our conclusion that the evidence warranted a finding that the defendant inflicted the injuries that resulted in Shawn's death is Dr. DuVally's testimony concerning the period within which, in his opinion, the injuries occurred. He testified that, as part of the autopsy procedure, "sections are taken of a number of the bruises that [he had] described; also, what amounts to routine sections. They're called the heart, lung, spleen, kidneys, adrenal, and so forth. The sections of the bruises were very recent. There was hemorrhage into the fat. [He could not] date them or time them exactly, but [he] would say certainly less than twelve hours." Dr. DuVally also characterized various other hemorrhages as "very recent" and when asked whether he could "give an outside time as to the length of the process" by which the massive skull fracture would have resulted in Shawn's death, he answered, "I'd say less than twelve hours is the best I could do; and, again, these are estimates." In response to the question, "Would that be twelve hours from the injury to the time of death," Dr. DuVally said, "Yes. Anywhere within . . . twelve hours. It could be much shorter."

Finally, the following questions addressed to Courtney, and her answers, are important:

*Q.*: "Now, at any time during . . . that night or early that morning, October 5, October 6, did you strike your baby, Shawn?"

*A.*: "No."

*Q.*: "Did you hit the baby at all?"

*A.*: "No."

*Q.*: "During the time that you were with the baby the previous day or that morning, did you see the baby fall in any way?"

*A.*: "No."

Based on the evidence recited above, the jury could have believed that the injuries leading to Shawn's death were inflicted within a period of twelve hours before 7:23 A.M. on October 6, 1989, a period during which only Fontaine, Payne, Courtney, and the defendant had access to Shawn. They also could have believed Fontaine, Payne, and Courtney's testimony that they did not hit or "do anything" to Shawn. From those facts based on direct evidence, the jury would have been warranted in inferring beyond a reasonable doubt that the fatal injuries were inflicted by the defendant when he was alone with Shawn, that is, between 10 P.M. on October 5, and 12:30 A.M. on October 6 or thereafter when he, Courtney and Shawn were together. Although nothing further is needed to reach the threshold of sufficient evidence, we make the observation that that inference finds support both in the testimony, which we shall discuss later in this opinion, concerning the defendant's expressed wish that the child be aborted, followed by the defendant's minimal support of Courtney and Shawn following Shawn's birth, and in the testimony of Shawn's pediatrician that, in routine office visits, the examinations disclosed no bruises, injuries, or abnormalities, suggesting that Courtney was paying attention to the child's needs and was not disposed to harm him.

We turn to the defendant's argument that the judge erred by admitting in evidence testimony of Dr. Robert Korn, which the defendant characterizes as Dr. Korn's opinion that the defendant killed Shawn. Dr. Korn, a board-certified physician in emergency medicine and pediatrics, had been a

practicing physician for twelve years at the time of the trial. He was on duty when Shawn was brought to the hospital and was part of the team that tried to resuscitate him. Dr. Korn testified without objection that, after a child died, it was his routine practice, and he did it in this case, to ask the parents to view the child after death because it helps them psychologically. The doctor recalled and made a note that the father of Shawn viewed the child. He did not recall whether the mother did and he made no note of it. He testified that he would not make a note if the parent grieved appropriately, but he would note unusual behavior. Dr. Korn noted that "[w]hen the father came to view the child, it seemed that he was very concerned about the physical findings on the child." The doctor testified that the defendant "came in and specifically paid attention to bruising on the child's body. He looked several times at the face and chest, turning the head from side to side, and looked at these bruises, and that was unusual behavior for a parent in that situation, in my opinion." Dr. Korn also testified that his record showed that the defendant had told him that he had changed Shawn's diaper that morning, October 6, at 6:30 A.M., that Shawn did not wake up, and that he seemed to be having trouble breathing. The record indicated that the defendant then placed the child back in the crib. The doctor testified, "Most parents, if their child is having trouble breathing, they dial 911. I can't tell you how many children cough and their child is immediately brought to the emergency room by ambulance."

Later, again without objection, Shawn's medical records for October 6 were introduced in evidence, including a child abuse report completed by Dr. Korn pursuant to G. L. c. 119, § 51A. The report form contains the following printed request: "Please give other information which you think might be helpful in establishing the cause of the injury and/or the person responsible for it. If known, please provide the name(s) of the alleged perpetrator(s)." Dr. Korn responded in writing: "Father examined child after death, looking at skin of face and chest multiple times. He also stated, when asked, that patient fell off couch several days ago but

was 'fine.' " The defendant argues that "[t]he prosecutor made no effort to qualify Dr. Korn as competent to testify about the normal or abnormal psychology of grief. . . . Dr. Korn . . . was presumptively unqualified. . . . [T]o the extent that the silent record implies a judicial finding that Dr. Korn was qualified to give an opinion . . . the finding was wrong." The defendant also contends that "[a]ll the scientific literature on the psychology of grief negates the reliability of his opinions. Based on this literature, there can be no question that Dr. Korn's 'opinion' was based on no cognizable scientific principle or theory. *Commonwealth* v. *Fatalo,* 346 Mass. 266 (1963)[.] *Frye* v. *United States,* 293 F. 1013, 1014 (D.C. Cir. 1923)."

There having been no objection to Dr. Korn's testimony, the question on appeal is whether its admission was error resulting in a "substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Cruz, ante* 27, 30 (1993). Although we do not agree with the defendant that Dr. Korn's testimony and child abuse report stating that the defendant's grief response at the hospital was unusual demonstrated his belief that the defendant had killed Shawn, we do agree that that testimony and report revealed Dr. Korn's opinion that the defendant's conduct at the hospital may have been some indication that the defendant was responsible for Shawn's death. However, the defendant has not demonstrated that, had he objected to the testimony, the judge would have excluded it. A judge has wide discretion in qualifying a witness to offer expert opinion. *Commonwealth* v. *Devlin,* 365 Mass. 149, 152 (1974). "[E]xpert testimony on matters within the witness's field of expertise is admissible whenever it will aid the jury in reaching a decision, even if the expert's opinion touches on the ultimate issues that the jury must decide." *Simon* v. *Solomon,* 385 Mass. 91, 105 (1982). A judge should consider "whether the witness possesses sufficient skill, knowledge or experience in the field of his testimony that the jury may receive appreciable assistance from it." *Commonwealth* v. *Boyd,* 367 Mass. 169, 182 (1975). We cannot say that the judge would have abused his discretion in

admitting in evidence Dr. Korn's opinion with respect to the inappropriateness of the defendant's grief response at the hospital. Furthermore, we reject the defendant's contention that the opinion testimony was inadmissible because it was "based on no cognizable scientific principle or theory" within the import of *Commonwealth* v. *Fatalo*, *supra*, and *Frye* v. *United States*, *supra*. Those cases focused on the admissibility of scientific testing methods, such as the polygraph test, see *Commonwealth* v. *Mendes*, 406 Mass. 201 (1989), and human leukocyte antigen (HLA) testing in paternity cases, see *Commonwealth* v. *Beausoleil*, 397 Mass. 206, 215 (1986). The evidence in question here does not involve scientific test results. Also, contrary to another of the defendant's arguments, it was not inadmissible "profile evidence." See *Commonwealth* v. *Day*, 409 Mass. 719, 723 (1991). We conclude that the admission of Dr. Korn's testimony and report concerning the defendant's grief response at the hospital was not erroneous for any reason argued by the defendant and, based on the same reasoning, we conclude that there was no error in admitting Dr. Korn's opinion that the defendant's conduct (in returning Shawn to his crib and leaving him after Shawn failed to awaken while his diaper was changed and while Shawn was having trouble breathing) was unusual.

The defendant next argues that the judge erroneously admitted evidence, offered without objection, that, during the course of Courtney's pregnancy with Shawn, the defendant urged her to have an abortion. The Commonwealth presented this evidence along with evidence that the defendant was already paying support for another son and that, for a period of time after Shawn's birth, the defendant contested his paternity of Shawn and rejected invitations to see him. The evidence was relevant to the defendant's attitude toward Shawn when Shawn died at the age of six months. We reject the defendant's argument that, even if the evidence was relevant, as a matter of policy we should not permit "a person's desire or lack of desire for a particular nonviable fetus to be aborted to raise the inference that that person bears ill

will . . . toward the child into which that fetus ultimately develops."

The defendant's fourth argument is that "[t]he prosecutor improperly elicited previously stricken hearsay opinion evidence and prejudicial vouching evidence." During the direct examination of Dr. DuVally, the pathologist, the prosecutor asked, "Now, with respect to the bruising or the injuries that you observed, Doctor, to the side of the child's face and lip area, do you have an opinion as to whether or not those injuries were consistent with a hand being placed over the face and mouth area and force then being applied to the child?" Dr. DuVally answered, "Could they have been? Is that the question?" The judge then excluded the question. Later in the trial, during the direct examination of Trooper Deborah Bruce, and without objection, the prosecutor asked if the trooper had asked the defendant how the victim could have sustained these injuries. She responded, "I believe we went over it again. He stated something about falling off the couch again. Then I had mentioned to him that the baby had bruises on both sides of his neck and tearing under his lip that was consistent with someone with a large hand placing it over the baby's face and pressing down hard. He stated to me at the time, 'I know what you mean, yes. I have large hands. I see what you're saying.' " Following this answer, the prosecutor then asked Trooper Bruce if she had ever seen Courtney's hands, to which she responded that Courtney is "a small person. So, they were really small hands." The defendant argues on appeal that this was an "unlawful ploy by the prosecutor to slip in inadmissible evidence through the back door. . . . Because of Officer Bruce's testimony, Dr. DuVally's stricken expert opinion was revived, without the benefit of cross-examination. This untested opinion, which the jury had heard from Dr. DuVally's lips before it was stricken . . . bolstered the Commonwealth's otherwise groundless 'large hands' theory — a theory also excluding [Courtney] who, Officer Bruce asserted, has 'really small hands.' "

We note that the jury did not hear what Dr. DuVally's opinion may have been with respect to whether Shawn's injuries "were consistent with" his assailant's having large hands, and Trooper Bruce did not purport to be repeating a theory that originated with Dr. DuVally. Nevertheless, we agree that Trooper Bruce's testimony should not have been allowed to stand. We are satisfied, however, that its admission did not result in a substantial likelihood of a miscarriage of justice. It seems quite clear that the identification of Shawn's assailant did not turn on whether the assailant's hands were large or small, but rather on the jurors' assessment of the credibility of Fontaine, Payne, and Courtney and the evidence bearing on the defendant's attitude toward Shawn and, to some degree, on the consciousness of guilt evidence.

Next, we take up the defendant's contentions that the judge erred in failing to give a jury instruction concerning consciousness of guilt evidence and in giving incorrect and harmful instructions on malice. The defendant states in his brief: "[T]he central ingredients of the Commonwealth's case were various acts and statements by [the defendant] allegedly demonstrating a guilty mind. The prosecutor emphasized all of these in his closing argument: (1) he argued that [the defendant] 'left a dying baby in his crib,' without calling the police for help, and gave an allegedly false explanation for doing so: 'this baloney about a cold'; . . . (2) he argued that [the defendant] examined Shawn's body inappropriately at the hospital: 'he knew what he was looking for'; . . . (3) he argued at length about allegedly inconsistent statements [the defendant] made to the police and others about telephone calls, about the baby falling off the couch, and about when he put the baby to bed: 'he's all over the ballpark' . . . ."

The defendant's brief continues: "Because of the Commonwealth's emphasis on this evidence and because of the lack of much else in its case against [the defendant], it was particularly important that the judge instruct the jury '(1) that they are not to convict a defendant on the basis of [consciousness of guilt evidence] alone, and (2) that they may, but need not,

consider such evidence as one of the factors tending to prove the guilt of the defendant.' *Commonwealth* v. *Toney*, 385 Mass. 575, 585 (1982)."

The defendant's trial counsel neither requested such an instruction nor objected to its absence. Recently, in *Commonwealth* v. *Cruz, ante* 27, 30 (1993), we held that a judge is required to instruct the jury according to this language in *Toney* whenever there is evidence of consciousness of guilt, regardless of whether the defendant so requests. "If the instruction is not given in a case such as this, which is subject to review under G. L. c. 278, § 33E, we test the error on the standard whether there was a substantial likelihood of a miscarriage of justice." *Id.* If the required instructions had been given in this case, "[w]e think it is reasonably clear that the verdict[ ] would not have been different." *Id.* at 32. There was considerable evidence introduced and argued by the Commonwealth in addition to the consciousness of guilt evidence. Apart from consciousness of guilt, the Commonwealth's case was reasonably strong. Although consciousness of guilt was argued by the Commonwealth, it surely was not the main focus of its presentation. In our view, it is extremely unlikely that the jury convicted the defendant solely on the basis of such evidence, or that this conviction resulted from the jury's mistaken notion that they not only could, but also were required, to consider the consciousness of guilt evidence in this case as a factor tending to prove the defendant's guilt.

Moving to the defendant's other challenge to the jury instructions, we consider whether the judge committed reversible error by instructing the jury on the so-called first prong of the malice aforethought element of murder, that is, proof that the defendant intended to kill the victim. *Commonwealth* v. *Burke*, 414 Mass. 252, 265 (1993). No contention is made that the judge gave an incorrect definition of the first prong. Rather, the defendant's contention is that, since there was no evidence of the defendant's intention to kill Shawn, the jury should not have been instructed that malice aforethought may be proved by evidence of intent to kill. We are

satisfied that that instruction did not give rise to a reasonable likelihood that the jury mistakenly found first prong malice aforethought, without sufficient evidence, rather than second or third prong malice, of which there had been considerable evidence. In addition, the identity of the assailant, not malice, was the principal issue in contention at the trial. The overly inclusive description of malice in the jury instructions, therefore, did not give rise to a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Puleio*, 394 Mass. 101, 108 (1985).

Finally, the defendant argues that the "evidence was insufficient to support the jury's verdict of murder committed with extreme atrocity or cruelty; and, even if minimally sufficient, the thrust of the evidence calls for reduction to second degree murder." In view of the number and severity of the six month old victim's injuries, culminating in death after the passage of an uncertain but appreciable period of time, we cannot conclude that the jury's determination of extreme atrocity or cruelty was unjustified by the evidence.

We have reviewed the entire record and, as urged by the defendant, we have considered "the cumulative effect" of any errors in the trial court that have been established. The defendant has not persuaded us that justice requires a verdict of less than murder in the first degree. Therefore, we decline to exercise our extraordinary power under G. L. c. 278, § 33E, to reverse the judgment or reduce the verdict.

*Judgment affirmed.*