## COMMONWEALTH *vs.* MARIA MACEY.

No. 97-P-1491.

Hampden. December 4, 1998. - May 28, 1999.

Present: BROWN, PORADA, & GREENBERG, JJ.

*Assault and Battery. Practice, Criminal,* Argument by prosecutor, Instructions
to jury.

There was no merit to a claim that G. L. c. 265, § 13J, is unconstitutional for
its failure to state the element of scienter. [43-44]
Sufficient evidence, including circumstantial evidence, was adduced at a
criminal trial to prove beyond a reasonable doubt that the defendant com-
mitted an assault and battery. [44, 47-49]
At a criminal trial, the prosecutor's closing argument did not create a
substantial risk of a miscarriage of justice [49], and there was no error in
the judge's final instructions [49].

INDICTMENT found and returned in the Superior Court Depart-
ment on March 26, 1996.

The case was tried before *Daniel A. Ford,* J.

*William T. Walsh, Jr.,* for the defendant.

*Jane Davidson Montori,* Assistant District Attorney (*Elizabeth
G. Dineen,* Assistant District Attorney, with her) for the Com-
monwealth.

BROWN, J. The defendant appeals from her conviction of an
assault and battery upon a child (i.e., a person under fourteen
years of age) that causes substantial bodily injury.[1] See G. L.
c. 265, § 13J. The child victim was one of the defendant's twin
sons, Justin Macey.

No reversible error has been made to appear. We treat the
various issues raised on appeal in turn. We will focus only on
such facts as are relevant to the analysis of the legal issues
presented.

---

[1] It was the Commonwealth's theory that the child's injuries conformed
exactly to those exhibited by the so-called "shaken baby syndrome."

1. *Scienter requirement.* The defendant contends that § 13J of c. 265 violates her due process rights protected by arts. 1, 10, and 12 of the Massachusetts Declaration of Rights because § 13J does not require scienter as an element of the offense. Section 13J prescribes the penalty for assault and battery causing "substantial bodily injury" to a child, but is silent regarding a definition of the crime itself.[2]

The defendant's argument that § 13J is unconstitutional because it lacks a requirement of "scienter" misses the mark. The scienter element is supplied by resort to the common law and is satisfied by proof that the defendant acted either intentionally or in a wanton or reckless manner.

"The Massachusetts statutes that advert to conduct involving assault . . . only set forth punishments and do not define the crimes. . . . By resort to the common law, our courts have recognized two categories of assault . . . ." *Commonwealth* v. *Musgrave*, 38 Mass. App. Ct. 519, 521 (1995), *S.C.*, 421 Mass. 610 (1996). "The classic definition of assault and battery is 'the intentional and unjustified use of force upon the person of another, however slight.' " *Commonwealth* v. *Welch*, 16 Mass. App. Ct. 271, 274 (1983), quoting from *Commonwealth* v. *Mc-Can*, 277 Mass. 199, 203 (1931). "The law recognizes, however, an alternative form of assault and battery in which proof of a wilful, wanton and reckless act which results in personal injury to another substitutes for (or in some cases is said, with some imprecision, to allow the 'inference' of) intentional conduct." *Commonwealth* v. *Welch, supra.* "[T]here is no basis for interpreting 'assault and battery' in G. L. c. 265, § 13J, in a manner different from the interpretation applicable to 'assault and battery' under G. L. c. 265, § 13A." *Commonwealth* v. *Cabral*, 46 Mass. App. Ct. 917, 918 (1999).

The judge's instructions included all the elements that the

[2]General Laws c. 265, § 13J, inserted by St. 1993, c. 340, § 21, provides in relevant part:

"Whoever commits an assault and battery upon a child and by such assault and battery causes substantial bodily injury shall be punished by imprisonment in the state prison for not more than fifteen years or imprisonment in the house of correction for not more than two and one-half years.

"Whoever, having care and custody of a child, wantonly or recklessly permits substantial bodily injury to such child . . . which assault and battery causes substantial bodily injury, shall be punished by imprisonment in the state prison for not more than five years, or by imprisonment in a jail or house of correction for not more than two and one-half years."

Commonwealth must prove beyond a reasonable doubt under the intentional conduct theory.[3] Moreover, the jury were not left to convict the defendant of assault and battery under the first definition, "which requires a finding that the touching or use of force was intentional," *Commonwealth* v. *Moore*, 36 Mass. App. Ct. 455, 459 (1994), because here the judge instructed the jury on the alternative theory of assault and battery.[4] We discern no basis upon which to reverse the defendant's conviction in this regard.

2. *Sufficiency of the evidence.* (a) The defendant contends that the denial of her motion for a required finding of not guilty was error. We disagree, as there was sufficient evidence, albeit much of it circumstantial,[5] adduced to prove beyond a reasonable doubt that the defendant committed a criminal assault and battery. See and compare *Commonwealth* v. *Roman*, 427 Mass. 1006, 1007 (1998).

We briefly summarize the relevant evidence. The defendant denied shaking the baby in a written statement taken by Trooper John Murphy on November 17, 1995. Trooper Murphy testified

---

[3]In the case at bar, the judge gave the following instruction on intentional assault and battery: "An intentional assault and battery is essentially the intentional and unjustified use of force upon the person of another. To prove intentional assault and battery, the Commonwealth must prove three things beyond a reasonable doubt. One, that the defendant touched the person . . . without having any right or justification for doing so. Second, that the defendant's act was intentional in the sense that it was not accidental. And third, that the touching involved actual or potential physical harm . . . . Now notice that the use of force must not only be intentional, it must also be unjustified . . . . Therefore, if the Commonwealth has proven beyond a reasonable doubt that the defendant used excessive or unreasonable force upon her child, you would then be warranted in concluding that the force was unjustified."

[4]"[T]he intentional doing of a wanton or grossly negligent act causing personal injury to another (which requires proof of actual physical injury)." *Commonwealth* v. *Moore*, 36 Mass. App. Ct. at 459.

[5]"[C]ircumstantial evidence is competent to establish guilt beyond a reasonable doubt. . . . An inference drawn from circumstantial evidence 'need only be reasonable and possible; it need not be necessary or inescapable.' " *Commonwealth* v. *Russell*, 46 Mass. App. Ct. 307, 308 (1999), quoting from *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977). "Moreover, the evidence and the permissible inferences therefrom need only be sufficient to persuade 'minds of ordinary intelligence and sagacity' of the defendant's guilt." *Commonwealth* v. *Russell*, *supra* at 309. "To the extent that conflicting inferences are possible from the evidence, it is for the fact finder to resolve the conflict." *Ibid.*

that the defendant told him that the only possible causes of Justin's (a twin) injuries were from her daughter, Michelle, who was somewhat jealous of the twins' birth; from the battery-operated swing that the baby had been in; or from her husband, Christopher. Trooper Murphy testified that when he had asked the defendant if at any point the baby had fallen from her arms, off of anything, or down the stairs, she had answered no.

The defendant's husband testified that he told the State troopers that his daughter may have been responsible for the baby's injuries.

The expert medical testimony was conflicting regarding whether the defendant's seven year old daughter, Michelle, would have been capable of inflicting the injuries sustained by the victim. On direct examination by the prosecutor, Dr. Steve Lieberman expressed the opinion that a seven year old child who was approximately four feet tall weighing approximately fifty pounds could not shake a six-week old baby that weighed six pounds violently enough to cause the type of injuries suffered by the victim. On cross-examination the same expert admitted that in his grand jury testimony he had stated the opinion that the girl could not have shaken the victim because one of the factors that he took into consideration was that "the baby weighed ten or eleven pounds"; in fact, the victim actually weighed under six pounds.[6] The doctor admitted that he did not know for certain whether or not the young girl could have done it.

The defendant's husband, Christopher, spent time alone with the baby on the day the baby was injured. He testified that when he left home on November 16, 1995, the day of the incident, Justin had "rosy cheeks" and very wide eyes, that he would "look around a lot, side to side," that he was warm, and that he was "just like any other baby, cries and whimpers every once in awhile." Christopher testified that the baby looked normal when he left to go to work that morning at ten after six.

He further testified that when he arrived home around 4 P.M. the defendant was on the phone. When she got off the phone, she told him that Justin had not taken his last feeding around eleven and that he had not eaten the entire afternoon. Christopher proceeded to pick up and feed Justin. Christopher testified that

---

[6]He also testified, "I think the older girl could have done it by throwing the baby down, but then there would have been evidence of some injuries but there wasn't, I don't think."

"when [he] fed him, [the baby] took the bottle a little slower at first than normally" and that he "had to coax him [Justin] a little bit just to get him to take the bottle but he did eventually take it." At that time Christopher noticed that "he [the baby] was cold and he was . . . kind of pale, a whitish color. . . . His eyes were glossy and I noticed he wasn't blinking like he normally would."

Christopher was left alone feeding Justin when the defendant left the house for ten minutes to pick up their daughter at the Boys and Girls Club. The Boys and Girls Club was a place where Michelle went on a daily basis after school. Christopher wrapped Justin in a blanket and put a hat on him because the baby was cold; then, Christopher "picked [James, the other twin] up and played with him for a little while."

According to Christopher, around 6:30 that evening, the defendant left to go to the grocery store and stayed out about three or four hours. During the time that the defendant was out, Christopher left the twins upstairs in the duplex with their seven year old sister, Michelle, for a short period. Christopher went downstairs to play his guitar. Christopher answered in the negative when asked, on cross-examination, whether he was worried about leaving Michelle with the twins when he went downstairs even though he had testified that his daughter had a temper. Christopher answered affirmatively when asked, also on cross-examination, whether his daughter was jealous of the twins.

> Q: "Now with regard to Michelle she displayed a great deal of anger and jealousy with regard to those twins; correct?"
>
> A: "Yep."
>
> . . .
>
> Q: "And she really did get mad, right?"
>
> A: "Yes."
>
> Q: "She went around the house slamming things, didn't she?"
>
> A: "Yep, stomping up and downstairs."
>
> Q: "What else did she do? . . ."

A: "Just walked up and down the stairs."

Q: "I think you said stomping?"

A: "Yes."

In a written statement taken on November 17, 1995, by Trooper John Murphy, the defendant stated that when her husband got home at 4 P.M. that day she told him that Justin had been sleeping since around noon. Her statement indicated that Christopher then picked Justin up and fed him and that Justin was not really taking his bottle and his body was cold. She stated that Justin looked white to her and that his eyes were glossy. The defendant stated that she told her husband, "I don't like the way he [Justin] looks; he doesn't look like himself." Christopher wrapped the baby in a blanket, and the defendant called their doctor between 6 and 7 P.M., because "at first I [the defendant] didn't think much of it, and Chris[topher] said he [Justin] was just cold."

In her statement, the defendant stated that she gave the doctor Justin's symptoms and the doctor asked her if Justin had a temperature. The defendant replied that she did not think so. In response to the doctor's questions, the defendant said that Justin was eating and moving his bowels. The doctor told the defendant to bring Justin in the next morning, since he already had an appointment. After that, the defendant said that her husband tried feeding Justin again at 7 P.M., and, even though he did not take the bottle at first, he then started taking it, so she thought that everything was fine, and she left to go shopping.

The defendant contends that the principle applies that, "[w]hen the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof." *Commonwealth* v. *Croft*, 345 Mass. 143, 145 (1962). Here, however, both the mother's statement and the father's testimony support the conclusion that the baby's injuries occurred sometime after 6:10 A.M., when the husband left for work, and before 4:00 P.M., when he returned home from work. The mother was the sole caretaker during that time. During that time, the daughter was at school and then at the Boys and Girls Club until her mother picked her up sometime after 4:00. Thus this is not a case where the evidence equally supports an inference that someone other than the

defendant caused the injuries. Nor does the evidence equally support an inference of guilt and an inference of not guilty, as the defendant contends.

Viewing the evidence and all reasonable inferences in the light most favorable to the Commonwealth, we conclude that the Commonwealth sustained its burden of proof. As in *Commonwealth* v. *Russell*, 46 Mass. App. Ct. 307, 310 (1999), in the case at bar "[t]he possibility of raising conflicting inferences from the evidence does not preclude allowing the fact finder to determine where the truth lies." Further, "the Commonwealth's proof in a criminal trial need not exclude all possible exculpatory interpretations of the evidence. . . . Nor is it necessary for the Commonwealth to negate the possibility that someone else other than the defendant might have committed the crime charged." *Id.* at 311. "The case thus stands in the not particularly unfamiliar posture of a child left in the custody of an identified adult, who suffers injuries of a type that are inconsistent with the explanation given by the custodian and not attributable in the circumstances to ordinary accidental causes." *Commonwealth* v. *Roman*, 43 Mass. App. Ct. 733, 735 (1997), *S.C.*, 427 Mass. 1006 (1998).

Here, as in *Russell*, "[t]here was no evidentiary gap in the Commonwealth's case, merely a question of the weight to be accorded to a chain of circumstantial evidence logically, even if not infallibly, connecting the defendant to the offense[] charged." *Commonwealth* v. *Russell*, 46 Mass. App. Ct. at 311.

(b) The defendant also claims there was insufficient evidence that the defendant "knew that she was causing substantial bodily injury at the time of the assault and battery." We reject that contention because the Commonwealth was not required to prove specific knowledge on the defendant's part.

Even if we were to assume knowledge is an element of the offense, we believe there was ample evidence that the defendant knew the consequences of her actions. Expert testimony indicated that the victim's injuries were caused by "violent" shaking; the defendant acknowledged that she had received pamphlets on shaken baby syndrome when the twins, James and Justin, were released from the hospital shortly after birth. In a statement written by the defendant and read by Trooper Murphy, the defendant acknowledged that "when I brought the babies home from the hospital I got one pamphlet about Shaken Baby Syndrome. I read it and I showed it to my husband and

said, 'Here, read this; this is what can happen if you shake the baby so we have to be really careful.' I also said, 'Because babies are very delicate.' "

3. *Closing argument.* The defendant did not object to the prosecutor's closing argument or request any curative instructions. The judge, however, did give clear, explicit, and emphatic instructions (often and at each relevant juncture) concerning all aspects of the evidence adduced[7] and commented upon by the prosecutor. Viewing the argument in its entirety "in light of all the circumstances, including the nature of the evidence, the persistence or flagrancy of the remarks, and the instructions of the judge," *Commonwealth* v. *Dougan,* 377 Mass. 303, 312 (1979), we conclude the prosecutor's closing did not rise to the level of reversible error, cf. *Commonwealth* v. *Costa,* 414 Mass. 618, 628-629 (1993), much less create a substantial risk of a miscarriage of justice.

4. *Judge's instructions.* The judge's final charge, to which there was no objection or request for a curative instruction, was neither defective nor deficient. The judge properly could and did instruct on both the intentional and wanton or reckless theories of assault and battery.

We summarily reject the defendant's claims that the judge failed to instruct on (a) proximate cause,[8] and (b) accident, as they are totally devoid of merit.

*Judgment affirmed.*

---

[7]The defendant also claims she was prejudiced by the admission of (as well as the prosecutor's comments on) demeanor evidence. This claim is of no avail. Much of the testimony now complained of was properly admitted on redirect examination after the defendant had opened an issue on cross-examination. In addition, testimony was admissible as a "summary description of [the defendant's] 'emotional, mental or physical condition.' " *Commonwealth* v. *Shine,* 398 Mass. 641, 656 (1986). See *Commonwealth* v. *Harrison,* 342 Mass. 279, 285 (1961). Even if there was error, we discern no material prejudice, particularly in light of the judge's contemporaneous curative instructions in response to, for the most part, sustained objections, and the comprehensive final charge.

[8]See, e.g., *Commonwealth* v. *Williams,* 399 Mass. 60, 62-63 (1987). Compare *Commonwealth* v. *Rhoades,* 379 Mass. 810, 824-825 (1980).