NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-1796                                          Appeals Court

COMMONWEALTH  vs.  HEATHER DRAGOTTA
(and one companion case[1]).

No. 14-P-1796.

Essex.      January 12, 2016. - February 25, 2016.

Present:  Kafker, C.J., Cohen, & Blake, JJ.


Assault and Battery.  Wanton or Reckless Conduct.  Parent and
     Child, Duty to prevent harm.  Child Abuse.  Practice,
     Criminal, Hearsay, Witness.  Evidence, Expert opinion,
     Hearsay.  Witness, Expert.



     Indictments found and returned in the Superior Court
Department on October 1, 2010.

     The cases were heard by Richard E. Welch, III, J.


     Jacob B. Stone for Steven Amos.
     Patrick Levin, Committee for Public Counsel Services, for
Heather Dragotta.
     Marcia H. Slingerland, Assistant District Attorney, for the
Commonwealth.


     KAFKER, C.J.  After a joint jury-waived trial in the

Superior Court, defendant Heather Dragotta was convicted of

_____

     [1] The companion case is against Steven Amos.

wantonly or recklessly permitting another to commit an assault and battery upon her infant daughter causing bodily injury (head injury), and defendant Steven Amos was convicted on three indictments charging assault and battery upon the same child causing bodily injury (two rib fractures, head injury, and arm fracture).[2]  On appeal, Dragotta and Amos both claim that the evidence was insufficient to sustain their convictions, and Amos adds that the expert testimony exceeded the permitted scope of such evidence.

Sufficiency of the evidence.  Viewing the evidence in the light most favorable to the Commonwealth, the judge was warranted in finding the following.  E.g., Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).

The victim was born on April 27, 2010, without any complications.  Dragotta is the victim's mother.  Amos was Dragotta's boyfriend but not the father of the child.  On the evening of June 3, 2010, Dragotta and Amos brought the five and one-half week old infant to the Lawrence General Hospital emergency room because she was not using her right arm and cried when it was touched.  The X-rays taken at the hospital showed

---

[2] The judge acquitted Dragotta of two counts of permitting an assault and battery causing substantial bodily injury related to the rib fractures and the arm fracture.  Before trial began, Dragotta's motion to dismiss three counts of assault and battery was allowed, as was so much of Amos's motion to dismiss that related to the three counts of permitting bodily injury.

that not only was the victim's right arm fractured, but that her left arm was bowing. The fracture of the right arm was a displaced transverse fracture, meaning that the fracture went entirely across the bone and the two ends were slightly offset. These findings prompted the hospital to file a report of abuse with the Department of Children and Families (DCF), pursuant to G. L. c. 119, § 51A (51A report). The victim was transferred to Boston Children's Hospital, and Dr. Celeste Wilson, the medical director of the child protective unit, was sought for consultation.

The next day, Wilson examined the victim and spoke to Dragotta and Amos about the cause of the injuries. Dragotta told Wilson that she returned home on June 3 with the victim after visiting her relatives in New Hampshire, and she gave the baby to Amos while she went into the kitchen. Shortly thereafter, Dragotta noticed the victim was not using her right arm.

Because of the unexplained injury to the victim's arm, Wilson ordered a full skeletal survey (X-rays), a computerized tomography scan (CT scan), and magnetic resonance imaging (MRI) of the victim's head. The X-rays, as the Commonwealth's expert,

Dr. Paul Kleinman,[3] testified, revealed seven rib fractures near the spine, six rib fractures on the side and the front of the ribs, one fracture of the right leg, five fractures of the left leg, and fractures of the right and left arms. He testified that rib fractures indicated the child's chest had been compressed with a force equivalent to that which occurs in a motor vehicle accident. Kleinman explained that rib fractures are "very very uncommon in infants," in part because a baby's rib cage is flexible; rather, they are "overwhelmingly seen in children who have been victims of abuse." The location and nature of the leg fractures were also very uncommon and would have occurred from significant twisting and pulling forces that are delivered to that extremity. According to Kleinman, the leg fractures were highly specific for abuse. While the right arm fracture was the single injury that an active child might incur, neither that fracture nor the fracture to the left arm was typical for a five and one-half week old infant who is not mobile.

Kleinman described the fractures as being of various ages, with the arm fracture being the most recent and the two fractures to the lateral ribs being more recent than the other fractures, having likely been incurred somewhere between seven

---

[3] At the time of trial, Dr. Paul Kleinman was a staff pediatric radiologist and director of the division of musculoskeletal imaging at Boston Children's Hospital.

days and two to four weeks earlier.[4]  In Kleinman's opinion, all of the victim's fractures were caused by inflicted injury.

Wilson reviewed the test conducted on the victim's head and testified that there was a subdural hematoma or bleeding on the brain.  Wilson gave an opinion that the injury was the result of inflicted trauma from an acceleration or deceleration motion to the head.  Two theories account for such an injury, either the head goes back and forth in such a motion as to create a whiplash or banging of the brain against the skull, or the head may accelerate into a solid object causing the skull to stop when it strikes the object while the brain continues going forward.

Wilson further opined that the victim would have been in pain when the fractures were inflicted, and she agreed that the arm injury was "acute."  Regarding the rib and leg fractures, the victim would have been "fretful," "irritable," or "fussy" when she was lifted or raised by others, or when her extremities moved.  Based on the "entire picture," Wilson formed the opinion and testified that someone had inflicted injuries on this child on more than one occasion.

---

[4] The fracture to the two lateral ribs form the basis of one of Amos's three convictions.  Because Dragotta and Amos lived in New Hampshire for two weeks of the child's life, more charges that included other injuries may not have been brought because the other injuries could not be dated to ensure they occurred in Massachusetts.

Dragotta and Amos were first asked about these injuries on Friday afternoon, June 4, 2010, by Detective Daniel Cronin and by Amy Silverio, the DCF worker assigned to the case. Interviewed alone, Dragotta explained that her infant daughter's health was unremarkable until she was about two weeks old, when she developed some gassiness and could be fussy at times. She told her pediatrician about this at the well-being visit on May 11, 2010, and according to Dragotta, he recommended gently moving the infant's legs in a bicycling motion to relieve the gas and demonstrated the maneuver for her. Dragotta showed Amos the maneuver when she got home.

When asked how she thought the victim could have sustained her injuries, Dragotta became tearful and admitted that a maneuver Amos used to help the victim relieve gas could have broken her ribs. Dragotta described the maneuver as one in which Amos would take the victim's "legs and push them towards her stomach and push down to relieve some gas or stool." Dragotta said Amos did this maneuver "pretty often" and "consistently for about one week." She acknowledged that the victim would cry when Amos did this. On one occasion, the victim made a particularly disturbing sound that prompted Dragotta to tell Amos not to do it anymore; she believed he heeded her request.

Dragotta thought the injury to the victim's head and arm were new. She suspected that her sister, who had briefly watched the victim during her visit to New Hampshire on June 3, may have done something. Dragotta told Silverio and Cronin that her sister suffered from depression and had a "couple OUI's [driving under the influence of alcohol]." Dragotta was informed that DCF would be taking custody of the victim and was visibly upset when she left the interview room and passed Amos.

Upon entering the interview room, Amos blurted out, "If I tell you I hurt her, can she get her baby back?" Cronin admonished him not to lie to protect someone else. Amos immediately volunteered that he could explain the rib fractures because he was "positive" he had broken her ribs. He demonstrated how he put his hands behind the victim's knees and pushed forcefully up and into the victim's abdomen. He said this technique was something he had developed on his own; he had not been shown how to do it. He acknowledged using a considerable amount of force and that he "pushed hard all the time."

When Amos did this, he said the victim would grunt, cry, and defecate. According to Amos, Dragotta had seen him do it three or four times. He said that the maneuver "relieved" the victim for two to three hours and that he was doing it to help Dragotta, who was stressed "paper thin." He admitted being

concerned that he was hurting the victim and that he was pushing too hard.

About a week before the interview, around May 28, Amos thought the technique was no longer working because nothing was coming out of the victim's buttocks. He stopped doing the technique because he was afraid he was causing damage to the victim's internal organs and her ability to go to the bathroom on her own.

Amos said he could also explain the head injury. During that Memorial Day weekend, about the time he stopped doing the knee-to-stomach maneuver, Amos used the victim "like a guitar," dipping and spinning her in the living room while he listened to music and Dragotta took a shower. He said he had her in one arm with a hand on her buttocks and two fingers around her neck until he made a forward motion and removed his two fingers from her neck leaving her head unsupported and her head came crashing down on his collarbone. The victim was still too young to be able to hold her head up, a fact Amos must have known as her caregiver. The victim cried for a couple of minutes and he saw bruising on her ear.

Although Amos initially denied having knowledge of what could have caused the injury to the victim's right arm (which prompted the visit to the emergency room), he admitted at the end of the interview that he may have grabbed her arm too

tightly when she was lying on his chest on the evening of June 3, 2010.

The following Monday, June 7, 2010, Silverio and Cronin interviewed Dragotta again, at her home. Her mother, Kim Dragotta, was with her. Dragotta admitted seeing the bruised ear during Memorial Day weekend and some bleeding in the victim's eye.[5] At the time, Dragotta asked Amos about it, and he told her about the infant's head striking his collarbone while he was dancing with her. Dragotta recognized the inappropriateness of Amos's behavior and acknowledged to Silverio and Cronin that Amos had no experience with infants.

Discussion. 1. Sufficiency of the evidence. Dragotta argues on appeal that the evidence was insufficient to support her conviction of wantonly or recklessly permitting Amos to commit an assault and battery upon her child causing a bodily injury, namely, the head injury.[6] "Wanton or reckless conduct may

---

[5] Wilson had also noticed a red spot in the victim's eye during her examination.

[6] Dragotta was convicted of only a single count that alleged she "wantonly or recklessly permitted bodily injury to such child or wantonly and recklessly permitted another to commit an assault and battery upon such child, which assault and battery caused bodily injury, to wit: interhemispheric subdural hematoma" pursuant to G. L. c. 265, § 13J(b). "[T]he elements of § 13J(b), fourth par., are (i) a child under fourteen; (ii) in care and custody; (iii) a substantial bodily injury; (iv) the defendant wantonly or recklessly permitted this substantial bodily injury, or wantonly or recklessly permitted another to commit an assault and battery on the child causing substantial

occur by act or omission where there is a duty to act and the failure to so act provides a 'high degree of likelihood that substantial harm will result to another.'" Commonwealth v. Robinson, 74 Mass. App. Ct. 752, 759 (2009), quoting from Commonwealth v. Welansky, 316 Mass. 383, 399 (1944). See, e.g., Commonwealth v. Pugh, 462 Mass. 482, 496-497 (2012). The wanton or reckless conduct here was Dragotta's continuing to allow Amos to care for the infant knowing that he did not know how to do so, that he had not followed instructions in the past, and that he had repeatedly and forcibly mishandled the child in such a manner as to cause her substantial harm.

The evidence that we consider under the Latimore[7] standard established that Dragotta regularly observed Amos push the five and one-half week old victim's knees into her chest with such force that she defecated. This was not at all like the gentle bicycling maneuver that Dragotta had been taught, and which she had explained to Amos. The force she saw applied was described by the expert as similar to that typically associated with a motor vehicle collision. The force here resulted in multiple fractures of the ribs and fractures of the right and left leg. In addition, the fractures were in various stages of healing

---

bodily injury." Commonwealth v. Roderiques, 462 Mass. 415, 422 (2012). See Commonwealth v. Robinson, 74 Mass. App. Ct. 752, 757 (2009).

[7] See Latimore, 378 Mass. at 677-678.

confirming that this technique had been used on multiple occasions. These fractures would have caused the child to be irritable and fussy, and while that alone would not be sufficient to cause a parent concern, in combination with having observed Amos's maneuver, it should have plainly alerted Dragotta to the high degree of likelihood that the victim was being injured by Amos.

Finally, Dragotta's tearful response during her interview with Silverio and Cronin, when she revealed that Amos's technique for relieving gas may have broken the victim's ribs, is direct proof that she knew the maneuver exposed the victim to bodily injury. Even if the judge credited Dragotta's testimony that she eventually told Amos to stop using this much force to compel the infant to pass gas and defecate, she nonetheless continued to allow him to provide unsupervised care for the child despite her knowledge that he obviously did not know how to care for the child safely, as later confirmed by the child's subsequent, substantial injuries, including the head injury for which Dragotta was held responsible for recklessly permitting.

In these circumstances, the judge could find that Dragotta knew or should have known that there was a substantial risk that Amos would injure the child if she remained in his unsupervised care. See Commonwealth v. Garcia, 47 Mass. App. Ct. 419, 422 (1999) (even if there were no direct evidence that parents of

thirty-three day old infant were aware of multiple rib, clavicle, and leg fractures, and a skull fracture, evidence of unexplained bruises and recognition that infant was in pain was sufficient circumstantial proof to conclude that "an ordinary person in the same circumstances would have realized the gravity of the danger"). See also Commonwealth v. Roderiques, 462 Mass. 415, 427 (2012) (evidence showed that defendant knew assaults were occurring but wantonly and recklessly failed to intervene).

Similarly unavailing is Amos's claim that the evidence was insufficient to support his convictions on three theories. He first claims that the injuries occurred when he was acting in loco parentis and attempting to care for the victim. The excessive, unreasonable force Amos used breaking the infant's ribs while trying to cause her to pass gas and defecate clearly exceeded any imaginable loco parentis rights.[8] See Garcia, supra. His desire to amuse and interact with the infant likewise did not encompass a right to spin and dip her recklessly "like a guitar." See ibid. Finally, there was no justification for the transverse fracture of the infant's arm.

---

[8] In making this argument, the defendant cites Commonwealth v. Dorvil, 472 Mass. 1 (2015), a parental discipline case. While it is clear that the defendant was not disciplining the infant, and he properly makes no such claim, we note that the force he used was so excessive that it falls beyond that permitted for discipline. See id. at 12 (a parent may not discipline with force that causes or creates "a substantial risk of causing . . . physical harm [beyond fleeting pain or minor transient marks]").

Next, Amos argues that proof of recklessness is absent because he was unaware that his conduct was likely to cause the victim substantial harm. The claim belies the recognition in his statement to Silverio and Cronin that the pushing maneuver may have been causing organ damage, that using the infant as a guitar and letting go of her head so that it crashed on his shoulder may have caused the brain bleed, and that his grabbing of the victim's arm so tightly may have broken it. Moreover, proof of recklessness only requires that the defendant intended to do the reckless act, not that he intended a specific result. See Welansky, 316 Mass. at 398-399; Commonwealth v. Macey, 47 Mass. App. Ct. 42, 48 (1999). All that is required is that "an ordinary person in the same circumstances would have realized the gravity of the danger." Garcia, supra at 422. Here, there is no question that there was sufficient evidence to support a finding that Amos intended the acts that caused the multiple fractures and subdural hematoma. We are also convinced on this evidence that an ordinary person in the same circumstances would have realized the substantial risk of injury to which he was subjecting an infant by engaging in such conduct. See ibid.

Amos's third contention, that the Commonwealth was required to prove that Amos had exclusive control of the victim, fails to recognize that viewing the evidence and the inferences in the light most favorable to the Commonwealth was sufficient to show

that Amos had control of the victim and that he inflicted the injuries.  See generally Macey, supra.  The Commonwealth need not "exclude all possible exculpatory interpretations of the evidence."  Ibid., quoting from Commonwealth v. Russell, 46 Mass. App. Ct. 307, 310 (1999).

2.  Wilson's expert testimony.[9]  Next, Amos argues that Wilson improperly testified to a neuroradiologist's opinion that the subdural hematoma was acute, thereby depriving him of the right to cross-examine the neuroradiologist.  In giving her own independent opinion, Wilson referenced a neuroradiologist with whom she had consulted in reaching her opinion and that his "impression" was that the injury had an "acuity to it" that made it unlikely to date back to birth.  Wilson made clear, however, that she was capable of reviewing the scans of the victim's head, that she had done so in this case, and that she had reached her own conclusion that the injury was acute.  Because Wilson did not testify to the opinion of the neuroradiologist but merely included the neuroradiologist's impressions as material upon which she had relied in reaching her own opinion, the defendant was not deprived of his rights under the Sixth

_____

[9] Amos claims that he objected to the "scope" of Wilson's testimony but without citation to the record.  The only objection Amos lodged during Wilson's direct examination challenged her ability to interpret and testify regarding the CT scan and MRI results.  The objection was overruled, and Wilson testified that she could read such scans.

Amendment to the United States Constitution. Furthermore, he was able to cross-examine Wilson on her testimony and the basis for her opinion. See Commonwealth v. Barbosa, 457 Mass. 773, 785 (2010); Commonwealth v. Greineder, 464 Mass. 580, 593-594 (2013). See also Crowe v. Marchand, 506 F.3d 13, 17-18 (1st Cir. 2007) (there is a custom and practice in the medical profession that doctors routinely rely on observations reported by other doctors, and it is unrealistic to expect a physician, as a condition precedent to offering an opinion, to have performed every test, procedure, and examination himself or herself); Mass. G. Evid. § 703 (2015).

Amos adds to this argument that Wilson's testimony regarding the neuroradiologist's impressions, as well as her recitation of the details underlying her differential diagnosis, ruling out other causes of the injury, violated the prohibition against an expert presenting on direct examination the specific information on which she relied. See Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 527-528 (1986); Greineder, supra at 594; Commonwealth v. Jones, 472 Mass. 707, 713-715 (2015).[10]

---

[10] Our common-law evidentiary rules permit expert opinion testimony, even if based on facts and data not in evidence, as this testimony violates neither the right of confrontation nor the prohibition against hearsay if the facts and data "are independently admissible and are a permissible basis for an expert to consider in formulating an opinion," provided, first, that the expert refrain on direct examination from presenting the specific information on which he or she relied and, second,

We assume without deciding that the admission of the challenged evidence was error.  Because the defendant did not object, we review only to determine whether the error, if any, created a substantial risk of a miscarriage of justice.[11]

Amos presented a defense grounded on the theory that the victim's bones were not healthy, which was undetectable to him or Dragotta, and therefore, his innocent actions would not have caused injury to a healthy child.  In support of this theory, Amos presented an expert who gave an opinion that the victim suffered from rickets or, alternatively, a copper deficiency, that caused the bones to weaken and break.  A second expert opined that the victim's increased platelet count generated from the healing fractures could have caused the subdural hematoma. A high platelet count will make it more likely blood will clot, and in this case, that clot may have expanded in the small collection of veins in the skull causing a small tear and bleed.

---

that the expert witness may be meaningfully cross-examined about the reliability of the underlying data.  See Greineder, supra at 583, 595; Jones, supra, citing Department of Youth Servs., supra.

[11] Contrary to the defendant's contention, the challenged evidence does not constitute testimonial evidence subject to the confrontation clause, because Wilson was not parroting the opinions of others, but was providing the foundational basis for her opinion that was independently derived.  Regardless of this distinction, the same standard of review generally applies to unobjected to error whether or not it is constitutional in nature.  See Commonwealth v. Vasquez, 456 Mass. 350, 358-360 (2010).

None of the challenged testimony undercut the defense theory. In particular, one expert agreed with Wilson that the subdural hematoma was acute, eliminating any risk of prejudice from Wilson having conveyed the same impression after consulting with the neuroradiologist. Moreover, the defense was able to elicit testimony from Wilson that bolstered its case, namely, that the victim did not exhibit signs typically associated with a head injury from an acceleration or deceleration event, and that Wilson failed to run a full set of tests to determine the health of the victim's bones. In these circumstances, the admission of the challenged evidence did not create a substantial risk of a miscarriage of justice.

Finally, this was a bench trial. "[I]t is presumed that the judge as trier of fact applies correct legal principals." Commonwealth v. Milo M., 433 Mass. 149, 152 (2001), quoting from Commonwealth v. Colon, 33 Mass. App. Ct. 304, 308 (1992). "[T]he judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose." Williams v. Illinois, 132 S. Ct. 2221, 2235 (2012). "In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." Harris v. Rivera, 454 U.S. 339, 346 (1981).

We conclude the judge here was not improperly swayed by having some of this information introduced on direct rather than through cross-examination.

Judgments affirmed.