NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12186


COMMONWEALTH  vs.  HEATHER DRAGOTTA.



Essex.     December 6, 2016. - March 21, 2017.

Present (Sitting at Lawrence):  Gants, C.J., Botsford, Lenk,
Hines, Gaziano, Lowy, & Budd, JJ.[1]


Assault and Battery.  Wanton or Reckless Conduct.  Child Abuse.



Indictments found and returned in the Superior Court
Department on October 1, 2010.

The cases were heard by Richard E. Welch, III, J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.


Patrick Levin, Committee for Public Counsel Services, for
the defendant.
Marcia H. Slingerland, Assistant District Attorney, for the
Commonwealth.


BUDD, J.  After a jury-waived trial, Heather Dragotta was

convicted on one indictment charging her with wantonly or

recklessly permitting another person to commit an assault and

_____

[1] Justice Botsford participated in the deliberation on this
case prior to her retirement.

battery that resulted in bodily injury to her infant daughter (victim).[2] G. L. c. 265, § 13J. The injury, an interhemispheric subdural hematoma, that is, bleeding between the hemispheres of the victim's brain, was recklessly inflicted by Dragotta's boy friend, Steven Amos, after Dragotta left the victim in his sole care while she took a shower.[3] The Appeals Court affirmed Dragotta's conviction, and we granted her application for further appellate review. Commonwealth v. Dragotta, 89 Mass. App. Ct. 119, S.C., 475 Mass. 1102 (2016). Because we conclude that the evidence was insufficient to establish that her conduct was wanton or reckless, we reverse the conviction.

Background. Much of the evidence presented at trial was directed to explaining the victim's injuries and their cause. Now, however, we are primarily concerned with Dragotta's state of mind when she left the victim in Amos's care to take a shower. Viewing the evidence at trial in the light most favorable to the Commonwealth, see Commonwealth v. Latimore, 378

---

[2] Dragotta was acquitted on two further indictments charging the same offense.

[3] Steven Amos was convicted on three indictments charging assault and battery on a child, causing bodily injury, for inflicting the hematoma and, in separate incidents, fractures to the victim's ribs and arm. His convictions were affirmed by the Appeals Court, and we denied his application for further appellate review. Commonwealth v. Dragotta, 89 Mass. App. Ct. 119, S.C., 475 Mass. 1103 (2016). Amos's convictions are not before us.

Mass. 671, 676-677 (1979), the trial judge, as fact finder, reasonably could have found the following facts.

The victim, who was Dragotta's first child, was born on April 27, 2010. Amos was not the victim's father, but he participated actively in her care and acted as her father in all respects.[4] After the birth, Dragotta and Amos temporarily stayed with Dragotta's parents in Weare, New Hampshire, so that the victim's grandmother could help with the baby. Also living in the Weare house were Dragotta's brother and his girl friend, as well as two of Dragotta's sisters. Dragotta, Amos, and the victim stayed in an upstairs bedroom in the Weare house for the first three weeks of the victim's life. Dragotta was the victim's primary caregiver during this time, with the grandmother taking care of her for a few hours each night to allow Dragotta and Amos to rest. For the first week of the victim's life, Amos spent almost all his time with Dragotta and the victim. He thereafter returned to work, but when he returned to the Weare house each evening, he again spent his time with Dragotta and the baby.

Two days after the victim was born, Dragotta took her to a pediatrician for a well-baby check. According to the

---

[4] Indeed, both the trial prosecutor and an investigator from the Department of Children and Families (department) referred to Dragotta and Amos as the victim's "parents."

pediatrician, the victim was healthy at that time and he had no concerns about Dragotta's conduct.

At some point in the first two weeks of the victim's life, the grandmother noticed an unusual intermittent cracking sound in the victim's upper back. She testified that the sound did not appear to be associated with any particular movement and that it did not appear to be causing any pain. Dragotta telephoned the pediatrician's office to ask about it, and a nurse there told her there was no cause for concern so long as it was not bothering the victim.

Over the next two weeks, the victim became more fussy. Both the grandmother and Dragotta attributed this to gas-related discomfort, which is common in breastfed infants. Dragotta and Amos gave the victim over-the-counter medications in an effort to relieve her symptoms, without success. On May 11, 2010, at another well-baby appointment with the pediatrician, Dragotta mentioned her concern about the gas-related symptoms. The pediatrician showed Dragotta a "bicycle" technique to help relieve the symptoms: laying the victim down on her back and then gently grasping her legs and rotating them, either alternately or together. The doctor explained that this can alleviate the baby's discomfort and the baby might pass gas or stool as a result. At this visit, the pediatrician again had no concerns about the victim's health or Dragotta's conduct.

After the appointment, Dragotta showed the bicycle technique to Amos, and each of them used this technique in an effort to relieve the victim's discomfort. At some point, Amos concluded that the bicycle technique did not work, but that the victim's symptoms could be alleviated by pushing her legs toward her stomach and pushing them down into her stomach to relieve gas or stool. Dragotta saw Amos using this technique after the checkup, and she knew that the victim occasionally cried when he did so.

On May 18, 2010, Dragotta and Amos moved to Amos's apartment in North Andover, about an hour's drive from the Weare house. While they were living there, the victim was with Dragotta about ninety per cent of the time. Amos cared for the baby by himself at times when Dragotta was showering, exercising, or doing housework, as well as in the mornings before leaving for work so Dragotta could sleep. Often, Amos would take the victim into another room to change her diaper and would consistently use his gas-relieving technique whenever doing so.

Shortly after they moved to Massachusetts, Dragotta saw Amos use his technique in a manner that caused the victim to make a noise that she did not like. On that occasion, Dragotta thought Amos might be pushing too hard and that it might be too much for her. Dragotta immediately told Amos to stop using that

technique, and she believed he complied. However, Amos continued using the technique until sometime the following week. As discussed more fully below, Amos's use of this technique caused the victim to sustain multiple rib fractures.

One day, during the week of May 24, Dragotta left the victim in Amos's care while she took a shower. As Amos would later tell investigators, he "had put some music on, and . . . he was acting like [the victim] was a guitar, and . . . he was dancing and spinning around the living room and dipping her up and down, at one point dipping her forward, [and] her head came crashing down on his collarbone." The victim cried for "a couple of minutes" after hitting her head. The following day, Dragotta noticed a bruise near the victim's ear and some redness in her left eye. Amos told her what had happened, and Dragotta told him to be more careful with the baby. She then telephoned the pediatrician's office and spoke with a nurse, who told her to watch the redness in the victim's eye and to call again if it became any worse. The Commonwealth contended, and the judge apparently found, that this "guitar" incident caused the victim to sustain a subdural hematoma. Dragotta's conviction arose from this incident.

However, the victim's injuries were not discovered until June 3 and 4, 2010. Dragotta and the victim spent the afternoon of June 3 visiting friends and family in New Hampshire. For a

time, Dragotta left the victim in the care of one of her sisters at the Weare house while she gathered some belongings. When they returned to the North Andover apartment that evening, Amos held the victim on the living room sofa while Dragotta was in the kitchen. At one point, Amos moved the victim's arm, and she "let out [an] awful cry," causing Dragotta to think something was wrong with her arm. Dragotta and Amos took the victim to the emergency room at Lawrence General Hospital, arriving at 7:45 P.M. that evening.

At that hospital, the victim's arm was X-rayed, revealing a fracture of the right radius. She then underwent a full skeletal survey, that is, X-rays of every part of her body. That skeletal survey revealed no other fractures. A physical examination of the victim likewise revealed no other injuries.

The victim was transferred to Boston Children's Hospital for further investigation as to the cause of the arm fracture. Dr. Celeste Wilson, the medical director of the hospital's child protection program, examined the victim during the morning of June 4. She observed a red spot in the victim's left eye, but did not consider it to be a cause for concern. Dr. Wilson also saw no marks on the victim's skin. Other than the right arm fracture, she did not see anything out of the ordinary in her examination of the victim. She recommended that a second

skeletal survey be performed, along with scans of the victim's head.

Dr. Paul Kleinman, a radiologist, reviewed the new skeletal survey and found several fractures to the posterior, anterior, and lateral portions of the victim's ribs.[5]  He opined that a likely mechanism for all of these fractures was a compression of the rib cage.  Based on the signs of healing visible in the skeletal survey, Dr. Kleinman opined that the lateral fractures were at least seven days old and that the posterior fractures were between ten days and six weeks old.  He could not form an opinion as to the age of the anterior fractures.

In addition, Dr. Kleinman found evidence of injuries to the victim's legs.  He opined that the injuries occurred from "twisting and pulling forces."  Both he and Dr. Wilson testified that the force required to cause such injuries was more than would be expected from routine handling by a caretaker.  Dr. Wilson also stated that the leg injuries could be caused by the "bicycle" maneuver if it was performed improperly.

As to the fracture to the victim's right radius, Dr. Kleinman testified that it showed no sign of healing and was

---

[5] The lateral fractures formed the basis for some of the indictments against Dragotta and Amos.  The anterior and posterior rib fractures were not mentioned in any of the indictments.

therefore a recent injury.  He could not offer an opinion as to its likely cause.

Dr. Wilson examined the scans of the victim's head and concluded that there was a small subdural hematoma between the hemispheres of the victim's brain.  She testified that a subdural hematoma could have numerous possible causes, but that the most likely cause was an acceleration-deceleration motion, which could result from shaking or from a sudden impact of the head against a surface.[6]  Both Dr. Wilson and Dr. Kleinman testified to their opinions that the victim's injuries were the result of inflicted trauma.  While Dr. Wilson expressed doubt that the hematoma could have been caused by the victim's head striking Amos's collarbone during the "guitar" incident, the record nonetheless is sufficient to support a finding that this was the cause.

The victim's injuries resulted in a report to the Department of Children and Families (department) pursuant to G. L. c. 119, § 51A.  Amy Silverio, a department investigator, met separately with Dragotta and Amos during the afternoon of June 4 at the department's Lawrence office.  North Andover police Detective Daniel Cronin also participated.  Dragotta, who was upset and tearful at times, told Silverio about the victim's

---

[6] There was, however, no evidence of any fractures to the victim's skull or injury to her neck, and the hematoma was not large enough to put pressure on her brain.

birth, her health up to that point, and about the events of June 3. Dragotta also described the bicycle technique that the pediatrician had taught her for relieving gas. This maneuver did not appear unusual to Silverio. When questioned as to how the victim might have sustained her injuries, Dragotta became tearful and said that she believed Amos's pushing technique, which she described for the investigators, could have broken the victim's ribs. She also told them that the victim would cry when Amos pushed, and that at one point, after the victim had made a sound Dragotta did not like, she told him not to use that technique anymore. As to the injuries to the victim's arm and head, Dragotta had no explanation, other than a suspicion that something might have happened while her sister was watching the baby. Silverio informed Dragotta that, due to the inflicted injuries, a care and protection petition would be filed on behalf of the victim.

After Dragotta's interview was finished, she left the room visibly upset, and Amos walked in. He immediately asked whether Dragotta would be allowed to keep the victim if he told them that he was the one who hurt her. Cronin told him not to lie to protect anyone, but to say only what had happened. Amos stated that he was positive that he had broken the victim's ribs using his gas-relieving technique. He described his technique and told Silverio and Cronin that he used it to relieve the victim's

discomfort and to allow Dragotta to rest, as she was "stressed paper thin." He also stated that he felt he was pushing too hard and hurting the victim. About a week to ten days before the interview, Amos had become concerned that he was damaging the victim's internal organs, and he stopped using his technique. It appeared to Silverio from the timelines provided by Dragotta and Amos that that Amos had continued using his technique after Dragotta had told him to stop.

When he was asked what might have caused the bleeding in the victim 's brain, he described the "guitar" incident. He also demonstrated the "guitar" dancing for Silverio and Cronin. This did not appear to them to be an appropriate way to handle the victim, a five-week old infant who could not yet hold her head up. As to the victim's broken arm, Amos speculated that this might have happened while Dragotta was taking the victim out of her car seat, or earlier while the victim was with the sister, although he did not believe either of them would hurt the victim intentionally. His only other suggestion was that he might have grabbed her arm too tightly when she started to slide off his stomach while they were on the sofa.

The following Monday, Silverio and Cronin went to the North Andover apartment and spoke further with Dragotta about the victim's injuries. The apartment appeared to Silverio to be an appropriate environment for a small child. In the course of her

investigation, Silverio spoke with every person who had had contact with the victim in the first six weeks of her life and found no one who had any concerns about the way either Dragotta or Amos treated her.  By the time of trial, according to the victim's father's testimony, the victim was a healthy, active three-year old child.

Discussion.  At issue is whether the Commonwealth proved that Dragotta acted wantonly or recklessly when she left the victim in Amos's sole care while she took a shower on the occasion of the "guitar" incident.  "Proof of recklessness requires 'more than a mistake of judgment or even gross negligence,' Commonwealth v. Michaud, 389 Mass. 491, 499 (1983), and has been defined as 'intentional conduct . . . involv[ing] a high degree of likelihood that substantial harm will result to another.'  Commonwealth v. Welansky, 316 Mass. 383, 399 (1944)."  Commonwealth v. Pugh, 462 Mass. 482, 496 (2012).  "To constitute wanton or reckless conduct, 'the risk . . . must be known or reasonably apparent, and the harm must be a probable consequence of the defendant's election to run that risk or of [her] failure reasonably to recognize it.'"  Commonwealth v. Levesque, 436 Mass. 443, 452 (2002), quoting Sandler v. Commonwealth, 419 Mass. 334, 336 (1995).  Dragotta's conviction can stand only if she realized, or if an ordinary person in her circumstances reasonably would have realized, the gravity of the danger to the

victim.  See Pugh, 462 Mass. at 496-497.  Put another way, the issue is whether Dragotta either knew or reasonably should have known that Amos was so manifestly unfit to care for an infant that the victim was in grave danger if she were left in his sole care even briefly.

Viewing the evidence in a light most favorable to the Commonwealth, at the time of the guitar incident, the week of May 24, 2010, Dragotta knew that Amos had not been using the gentle "bicycle" technique to relieve the victim's gas symptoms, but the more forceful pushing technique.  The trial judge, as fact finder, rationally could have found that she also saw him, on one occasion, use this technique forcefully enough to cause pain and distress.  On that occasion, Dragotta told Amos to stop using that technique, and she believed he complied.  There is no evidence, however, that Dragotta or anyone else suspected that Amos's technique caused injury until June 4, when the rib fractures were discovered.  In particular, there is no evidence of bruising connected with the rib fractures,[7] nor is there

---

[7] Dr. Celeste Wilson testified that, during her examination of the victim, she was informed that the victim had had a bruise on her rib about one and one-half weeks previously.  The record does not reveal the size and shape of the bruise or its precise location.  It also appears that Dr. Wilson attached no significance to that bruise, even after learning of the victim's rib fractures, other than to say that bruising is not common in a five-week old infant.  There is thus no basis on this record to find that the bruise was related to the rib fractures or that

evidence that the victim was behaving as though she was in acute pain, so as to cause a reasonable person to be concerned that she had an undiscovered injury. Cf. Commonwealth v. Garcia, 47 Mass. App. Ct. 419, 422-423 (1999) (upholding conviction under § 13J where infant had bruises and mother had noticed pain, but her explanations were implausible). Although Dr. Wilson testified that she would expect an infant with rib fractures to cry, she consistently qualified that testimony by stating that babies cry for many reasons and that it is difficult for a parent to know why a baby is crying at any given time. There is no evidence that the victim cried in any way that was out of the ordinary for an infant at any time before the "guitar" incident, apart from the sound the victim made the last time Dragotta saw Amos performing his modified bicycle maneuver. As for that, the evidence was simply that the victim made a noise that Dragotta did not like, not that she was crying inconsolably or that she continued to make that noise even after Amos stopped pushing. Indeed, the doctors at Lawrence General Hospital did not detect the rib fractures when they examined the victim and performed the first skeletal survey, nor did Dr. Wilson observe anything out of the ordinary, apart from the broken arm, in her examination of the victim at Boston Children's Hospital. It was

---

it should have caused Dragotta to suspect that the victim had a serious injury inflicted by Amos.

not until the second skeletal survey was performed that the rib fractures were discovered.  Where the victim presented no outward sign of injury that was detectable to medical professionals, we do not see how Dragotta could have suspected injury.

The Commonwealth argues that Dragotta's later statement to the investigators that Amos's technique could have caused the rib fractures proves that she was aware of this possibility before the fractures were discovered.  We disagree.  To draw that conclusion, one would have to find that Dragotta suspected that the victim's ribs might have been injured and did not seek medical attention for that injury, although she had sought medical advice for the benign cracking sound in the victim's back, had kept the victim's routine pediatric appointments, and later sought medical attention for the arm injury.[8]  In our view, the only rational inference from Dragotta's statement at the interview is that, upon learning that the victim's ribs were fractured and being asked what might have caused this, she made the connection to Amos's technique.  On all the evidence, at the time she left the victim with Amos, there was no reason for Dragotta to suspect that his technique had caused not only pain, but also substantial injuries.

---

[8] In this regard, we note that the judge acquitted Dragotta of recklessly permitting Amos to inflict the rib injuries.

Moreover, although Amos was certainly an inexperienced and flawed caretaker, it is undisputed that he did not intentionally hurt the victim, and Dragotta had no reason to believe that he would. There was no risk that he would seize the opportunity to harm the victim if left alone with her for even a short time. To be sure, we do not hold that a defendant cannot be convicted of recklessly permitting assault and battery to a child merely because the principal assailant acted recklessly rather than intentionally or merely because the child was in the assailant's care for only a short time. However, Amos's intentions toward the victim and the length of time he would be alone with her are relevant to the gravity of the risk that Dragotta placed her in by leaving her in his sole care.

Finally, we find it difficult to imagine what more a reasonable person in Dragotta's position should have done. See Pugh, 462 Mass. at 497, citing Welansky, 316 Mass. at 398-399 ("the inquiry as to reasonable conduct is central to whether the defendant acted recklessly from an objective perspective"). When she saw that Amos's technique caused pain and distress to the victim, she put a stop to it, and she believed he stopped using his technique. Although there might have been other actions she could have taken -- ending the relationship and moving out, or arranging for another adult to be present with Amos and the victim while she showered -- we cannot say that any

reasonable person would have been obligated to take these steps, given the facts known to Dragotta at that time.

In sum, the evidence at trial showed at most that Dragotta's decision briefly to leave the victim alone with Amos was an error in judgment.  The evidence was not sufficient as a matter of law to find that her conduct involved a high degree of likelihood that substantial harm would result.  Therefore, her conviction of wantonly or recklessly permitting an assault and battery on the victim cannot be sustained.

Conclusion.  The judgment is reversed, the finding is set aside, and judgment shall enter for the defendant.

So ordered.